David Leit
Mark Kesslen
Matthew Savare
Frank LeFebvre
**LOWENSTEIN SANDLER PC**
Attorneys At Law
65 Livingston Avenue
Roseland, New Jersey  07068
973.597.2500
Attorneys For Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SARNOFF CORPORATION, | Civil Action No. 08- |
| Plaintiff, | |
| v. | **COMPLAINT** |
| HOYOS GROUP, HOYOS, INC., GLOBAL RAINMAKER, INC., HECTOR HOYOS, AND KEITH HANNA. | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Sarnoff Corporation ("Sarnoff") by and through its counsel, Lowenstein Sandler PC, by way of Complaint against Defendants Hoyos Group, Hoyos, Inc., Global Rainmaker, Inc., Hector Hoyos, and Keith Hanna (collectively, the "Defendants"), alleges and avers as follows:

**NATURE OF THE ACTION**

1.      This is a civil action for a declaratory judgment of non-infringement of intellectual property, and to remedy acts of (1) breach of contract, (2) breach of duty of loyalty, (3) misappropriation of trade secrets, (4) tortious interference with prospective economic advantage, (5) conversion, (6) false designation of origin, (7) false advertising, (8) unfair competition, (9) unjust enrichment, and (10) fraud, arising under federal, state, and common law.

2.      For over four years, Hector Hoyos ("Hoyos") and his various companies, Hoyos Group, Hoyos, Inc., and Global Rainmaker, Inc. ("GRI") (collectively, the "Hoyos Companies"), served as limited agents of Sarnoff, engaged solely to help market and sell certain technology designed, developed, and manufactured exclusively by Sarnoff.   Keith Hanna ("Hanna"), a former long-time, key technical employee of Sarnoff, was hired by Hoyos after resigning from Sarnoff, and assisted Hoyos in such marketing efforts.

3.      As agents of Sarnoff—and, in the case of Hanna, as an employee of Sarnoff—Defendants were privy to and had access to certain highly confidential and proprietary information of Sarnoff.

4.      Instead of using Sarnoff's confidential and proprietary information to market Sarnoff's technology—as they had been hired to do—Defendants have impermissibly used the confidential and proprietary information to launch their own competing product and interfere with and stifle Sarnoff's prospective business relations.

**PARTIES**

5.      Sarnoff is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at 201 Washington Road, Princeton, New Jersey 08540.

6.      Upon information and belief, Hoyos Group is a corporation organized and existing under the laws of Puerto Rico, with its principal place of business at Popular Center Building, 209 Munoz Rivera Avenue, 18th Floor, San Juan, Puerto Rico 00918, and a New York office located at 10 East 53rd Street, 33rd Floor, New York, New York 10022.  Hoyos Group is transacting and doing business within this judicial district, is committing the acts complained of

herein within this judicial district, and is subject to the jurisdiction of this Court pursuant to the laws of the State of New Jersey and Rule 4 of the Federal Rules of Civil Procedure.

7.      Upon information and belief, Hoyos, Inc. is a corporation organized and existing under the laws of Puerto Rico, with its principal place of business at Popular Center Building, 209 Munoz Rivera Avenue, 18th Floor, San Juan, Puerto Rico 00918, and a New York office located at 10 East 53rd Street, 33rd Floor, New York, New York 10022.  Hoyos, Inc. is transacting and doing business within this judicial district, is committing the acts complained of herein within this judicial district, and is subject to the jurisdiction of this Court pursuant to the laws of the State of New Jersey and Rule 4 of the Federal Rules of Civil Procedure.

8.      Upon information and belief, GRI is an affiliate of Hoyos Group and is a corporation organized and existing under the laws of Puerto Rico, with its principal place of business at Popular Center Building, 209 Munoz Rivera Avenue, 18th Floor, San Juan, Puerto Rico 00918, and a New York office located at 10 East 53rd Street, 33rd Floor, New York, New York 10022.  GRI is transacting and doing business within this judicial district, is committing the acts complained of herein within this judicial district, and is subject to the jurisdiction of this Court pursuant to the laws of the State of New Jersey and Rule 4 of the Federal Rules of Civil Procedure.

9.      Upon information and belief, Hoyos is an individual citizen of the United States and the Commonwealth of Puerto Rico.  Hoyos is the Chief Executive Officer of the Hoyos Companies and is transacting and doing business within this judicial district, is committing the acts complained of herein within this judicial district, and is subject to the jurisdiction of this Court pursuant to the laws of the State of New Jersey and Rule 4 of the Federal Rules of Civil Procedure.

10.     Upon information and belief, Hanna is an individual citizen of England and a permanent resident of the State of New Jersey.  Hanna is a former employee of Sarnoff and the current Chief Scientist of the Hoyos Group.  He is transacting and doing business within this judicial district, is committing the acts complained of herein within this judicial district, and is subject to the jurisdiction of this Court pursuant to the laws of the State of New Jersey and Rule 4 of the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

11.     This action arises under the Declaratory Judgments Act, 28 U.S.C. §§ 2201, *et seq.*; the Copyright Laws of the United States, 17 U.S.C. §§ 101, *et seq.*; and under related and other laws of the State of New Jersey, both statutory and common law.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367, and 2201.  In addition, this Court has pendent jurisdiction over the related state claims.

12.     This Court has personal jurisdiction over the Defendants, because they do business in this District.

13.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Sarnoff's claims occurred in this District.

## FACTUAL BACKGROUND

### I.     Sarnoff's Iris Recognition Technology

14.     In today's tumultuous sociopolitical climate, reliable and efficient identity verification has become a critical necessity.  Over the last decade, biometric identification—based on characteristics such as a person's fingerprints, retinas, irises, facial patterns, and gait—has emerged as the leading solution to meet the demand for increased security.

15.     For over sixty years, Sarnoff has been a world leader in research and development, taking innovative ideas and transforming them into valuable and marketable commercial solutions.

16.     Using its highly advanced sensing, vision, and optics technology, Sarnoff has made tremendous advances in iris recognition, identification, and authentication, creating its first ground-breaking iris recognition system in 1995.

17.     In July 2004, building upon its iris recognition technology, Sarnoff developed its innovative "Iris on the Move"™ system ("IOM System"), a bundled biometric iris image capture system consisting of proprietary software, hardware, designs, databases, algorithms, processes, trade secrets, and know-how.

18.     Hanna, who had been an employee of Sarnoff since January 1990, was intimately involved in Sarnoff's research and development efforts with respect to iris recognition technology.  Accordingly, he was privy to Sarnoff's confidential and proprietary information.

19.     As a condition of his employment at Sarnoff, Hanna signed an Employee Patent and Computer Software Agreement on January 3, 1990, which specified, among other things, that all inventions that Hanna created within and during the scope of his employment belonged to Sarnoff, and that upon his termination or resignation, he would return to Sarnoff, not use, and not disclose the confidential information he received during his employment.

20.     Sarnoff is the owner of the following five patent applications relating to its iris recognition technology: Serial Number 10/939,943 ("Method and Apparatus for Performing IRIS Recognition from an Image"); Serial Number 11/334,968 ("Method and Apparatus for Providing Strobed Image Capture"); Serial Number 11/364,300 ("Method and Apparatus for

Designing IRIS Biometric Systems for use in Minimally Constrained Settings"); Serial Number 11/377,042 ("Method and Apparatus for Obtaining Iris Biometric Information from a Moving Subject"); and Serial Number 60/841,768 ("IOM Door Configuration (or Method and Apparatus for Iris Biometrics Above an Entryway using IOM Technology))."

21.    The IOM System is capable of quickly, efficiently, and seamlessly identifying numerous people as they walk through a portal or entranceway, using Sarnoff's iris recognition technology.  With fewer constraints on users than any other iris recognition system, Sarnoff's IOM system is able to identify up to twenty moving subjects per minute, making it particularly useful for expediting security screening at large facilities such as airports, government buildings, and power plants.

## II.    Sarnoff Engages Defendants to Help Market and Sell Its Iris Recognition Systems

22.    In or around August 2002, Sarnoff and Hoyos Group began to discuss the possibility of Sarnoff's retaining Hoyos Group to help market and sell Sarnoff's iris recognition systems.  As detailed below, over the course of the next several years, Sarnoff and the Hoyos Companies entered into a series of agreements with respect to Sarnoff's iris recognition technology, including the IOM System.

23.    As they first began to discuss this possible business relationship, both parties recognized that Sarnoff would need to provide to the Hoyos Companies certain proprietary technical and financial information, including confidential trade secrets, hardware, software, know how, designs, copyrights, patent applications, source code, and other proprietary intellectual property (the "Proprietary Information").

24.     In order to protect and preserve Sarnoff's Proprietary Information, on October 8, 2002, Sarnoff and Hoyos Group entered into a Confidential Disclosure Agreement governing Hoyos Group's use and disclosure of the Proprietary Information (the "2002 CDA").

25.     Under the 2002 CDA, Hoyos Group was permitted to use the Proprietary Information "solely for the purpose of evaluations of mutual business opportunities unless otherwise agreed in writing between the parties."  In addition, the 2002 CDA specified that "[a]ll materials containing Proprietary Information delivered by [Sarnoff] under this Agreement are and will remain the property of [Sarnoff]."  Under the terms of the 2002 CDA, these obligations applied only to information that Sarnoff disclosed to Hoyos Group prior to October 2003.

26.     Over the course of the next several years, the parties amended and extended the 2002 CDA several times to govern disclosures made by Sarnoff after October 2003. The latest amendment, which was signed on October 7, 2005, extended the CDA until October 7, 2006 (the "October 2005 CDA").

27.     On April 4, 2005, Hanna resigned from Sarnoff.  As part of his separation from Sarnoff, Hanna signed an Employee Termination Statement, which reiterated Hanna's contractual obligations contained in the Employee Patent and Computer Software Agreement.  In the Employee Termination Statement, Hanna acknowledged, among other things, his "obligation not to disclose to others or use confidential information of Sarnoff Corporation or its clients that [he] acquired, received, or originated during [his] employment period."  In addition, Hanna acknowledged that he was required to (a) return to Sarnoff all confidential materials, and (b) disclose and assign to Sarnoff all inventions or other intellectual property that he was obligated to disclose and assign in accordance with the terms of his Employee Patent and Computer Software Agreement.

28.   Upon information and belief, after resigning from Sarnoff, Hanna immediately accepted a position as Chief Scientist at Hoyos Group, focusing primarily, if not exclusively, on biometrics and iris recognition technology.

29.   In the spring of 2005, representatives from Sarnoff met with General Electric Corporation ("GE") to discuss Sarnoff's IOM System.   During the meeting, GE expressed interest in the technology, but stated that the IOM System, in its current configuration, was not what GE needed at the time.

30.   In September 2005, representatives from Sarnoff presented the IOM System at the Biometric Commission Consortium in Washington, D.C.   At this conference, a host of companies, including LG and Honeywell, expressed interest in Sarnoff's IOM System. L-1 Identity Solutions, Inc. ("L-1") also expressed significant interest, and offered Sarnoff five million dollars for the rights to the IOM System.

31.   In or around October 2005, Hoyos learned of L-1's offer and informed Sarnoff that he could sell the IOM System for at least twenty million dollars.

32.   Sarnoff, which was understandably interested in maximizing the selling price of its IOM System, entered into an engagement letter with Hoyos, Inc. on October 24, 2005 whereby Hoyos, Inc. agreed to act as Sarnoff's non-exclusive agent to explore the sale of the assets relating to the IOM System to the Thales Group (the "Thales Agreement").

33.   Pursuant to the Thales Agreement, Hoyos, Inc. was permitted to "hold itself out only as a limited agent of Sarnoff."   In addition, the Thales Agreement expressly provided that "[n]o licenses are granted or implied by either party to the other pursuant to this Agreement," and "[d]uring the term hereof and for a period of five (5) years thereafter, each

party shall maintain the confidentiality of any confidential information received by it from the other party."

34.     Pursuant to a letter dated November 4, 2005, Sarnoff and Hoyos, Inc. terminated the Thales Agreement.

35.     On the same day, Sarnoff and GRI entered into an agency agreement very similar to the Thales Agreement.  Under the new agreement, GRI was to serve as Sarnoff's non-exclusive agent to explore the sale of the assets relating to the IOM System to the Thales Group, GE, and GE's wholly-owned subsidiaries (the "Thales/GE Agreement").

36.     As in the Thales Agreement, the Thales/GE Agreement restricted GRI to hold itself out only as a "limited agent" of Sarnoff, imposed mutual confidentiality obligations on the parties, and expressly stated that no licenses were granted or implied pursuant to the agreement.

37.     On December 12, 2005, Sarnoff and GRI entered into another agency agreement whereby GRI was to serve as Sarnoff's non-exclusive agent to explore the sale of the assets relating to the IOM System to Pegasus Capital Advisors, L.P. (the "Pegasus Agreement").

38.     As in the Thales Agreement and the Thales/GE Agreement, the Pegasus Agreement restricted GRI to hold itself out only as a "limited agent" of Sarnoff, imposed mutual confidentiality obligations on the parties, and expressly stated that no licenses were granted or implied pursuant to the agreement.

39.     On December 20, 2005, Sarnoff, GRI, Pegasus Partners III, L.P. ("Pegasus"), and Pericles Capital Partners, LLC entered into a Confidential Disclosure Agreement (the "December 2005 CDA") governing the use and disclosure of the parties'

"Proprietary Information," which was defined as "all technical and/or business information relating to **Iris on the Move**. . . ."

40.     As was the case with the 2002 CDA, the December 2005 CDA permitted the parties to use the Proprietary Information "solely for the purpose of evaluations of mutual business opportunities unless otherwise agreed in writing between the parties."  In addition, the December 2005 CDA specified that "[n]o license, ownership interest, or other right to use Proprietary Information of the other party is conveyed, implied or otherwise created by this Agreement . . . ."

III.     **Sarnoff's Development of "Iris at a Distance" and the "Tier-2 Product"**

41.     In or about February 2006, Sarnoff developed marketing materials for the IOM System, including a modular IOM System.

42.     On February 15, 2006, Vincent Endres, Sarnoff's Vice President of Portfolio and Corporate Development, sent an e-mail to representatives from Pegasus, stating that another company had expressed interest in purchasing Sarnoff's assets related to the IOM System, and that the potential buyer would be performing due diligence in the near future.

43.     Acting in its role as Sarnoff's non-exclusive agent, GRI scheduled a meeting for April 17, 2006 between Sarnoff and the potential buyer, GE Security.  Hanna, who was then working at Hoyos Group, assisted in setting up the meeting.

44.     In an email immediately prior to the meeting, Hanna informed Sarnoff that "GE's interest is in integrating IOM into their airport EntryScan portal. . . . Our objective is to have [Andy Bulkley, a product manager from GE Security,] go away thinking that it is technically possible, after some relatively low-risk integration work."

45.     At the April 17, 2006 meeting, Sarnoff demonstrated Sarnoff's modular IOM System to GE Security.  During the meeting, Sarnoff discussed GE's interest in integrating Sarnoff's technology into GE's airport EntryScan portal, including the concept of installing Sarnoff's IOM System around the portal, which resembled a doorway, in a way that would eliminate the need for computers at the point of capturing the irises.

46.     On April 21, 2006, Hanna sent Endres and Ray Kolczynski, a Senior Program Manager at Sarnoff, a presentation that summarized the concepts that Sarnoff had proposed during the April 17th meeting. The presentation provided a broad overview of Sarnoff's IOM System and discussed the advantages of iris authentication over other forms of biometric identification.

47.     On April 28, 2006, Bulkley e-mailed Hanna a preliminary concept drawing of the IOM System at a door, which documented the concepts that Sarnoff had presented during the April 17th demonstration.

48.     Over the course of the next week, Hanna, who continued to function as a limited agent of Sarnoff, worked with several Sarnoff representatives and Bulkley to describe in greater detail Sarnoff's plans for integrating its IOM System into an over-the-door system to be used with GE's portal.

49.     For example, on May 1, 2006, Hanna sent Kolczynski some broad design considerations, which he asked Kolczynski to review before Hanna modified the April 21st presentation.

50.     After conferring with Kolczynski and other Sarnoff representatives on the detailed technical issues, Hanna updated Bulkley's April 28th presentation with the Sarnoff Proprietary Information that he had received from Sarnoff.  In the revised presentation, Hanna

broadly outlined Sarnoff's concept for an over-the-door system, how Sarnoff envisioned the system would operate, and the process by which the IOM System would be connected to GE's iris database and iris capture board. Hanna e-mailed this presentation to Bulkley and Kolczynski on May 2, 2006.

51.    On May 8, 2006, after again conferring with Sarnoff engineers and receiving additional Sarnoff Proprietary Information, Hanna sent Bulkley and Kolczynski a slightly revised and updated presentation of how Sarnoff planned to integrate its IOM System into an over-the-door system.   The updated presentation included a "Product Roadmap Summary" that outlined the three tiers of Sarnoff's IOM System, with each tier representing a different market segment.  The second tier included a "doorway, walkup desk application."

52.    Over the course of the next several months, Sarnoff, at great cost and expense, designed, built, and tested a prototype of its over-the-door system.  This over-the-door system, which was based on Sarnoff's proprietary IOM technology, was known as "Iris at a Distance" ("IAD") or the "Tier-2 Product."

53.    On June 2, 2006, Thomas Zappia, a Sarnoff employee, created detailed sketches of the Tier-2 Product.

54.    On June 13, 2006, Endres wrote to Hanna, stating Sarnoff had received a draft memorandum of understanding ("MOU") from GE Security proposing a joint venture between GE Security and Sarnoff for the development of the Tier-2 Product, and that Sarnoff was ready to build and test a prototype unit.

55.    Two days later, Kolczynski wrote to Hanna, indicating that Sarnoff had made some important technical modifications to the Tier-2 Product, which enabled Sarnoff to

run successful tests of the prototype unit.  On the same day, Kolczynski sent Bulkley an email informing him that Sarnoff successfully tested its prototype unit.

**IV.    Defendants' Attempts to Claim Ownership in Sarnoff's Intellectual Property**

56.    On the eve of Sarnoff's execution of the MOU with GE Security, Defendants improperly injected themselves into the negotiations, claiming that they owned some of the intellectual property embodied in the Tier-2 Product.

57.    Specifically, on June 16, 2006, Hanna sent an e-mail to Endres with an attachment that purported to be the intellectual property that Hoyos would contribute to the proposed joint venture.  Hanna wrote: "[W]e will transfer the IP to Sarnoff and then Sarnoff can then just put it in the JV. . . . [W]e should also plan to show GE the Hoyos/Sarnoff agreement for the IP in the near future.  Since there is an expectation on the GE side of inclusion of Hoyos IP, I should take a passive role on the Friday IP call."

58.    Neither GE Security nor Sarnoff had previously discussed or contemplated including any of the Hoyos Companies as a party to the joint venture.  In fact, all of the agreements between Sarnoff and the Hoyos Companies clearly specified that the Hoyos Companies were limited agents of Sarnoff, engaged solely to help market and sell Sarnoff's IOM System.

59.    Endres responded to Hanna's email on June 16th, reiterating that Hoyos was hired by Sarnoff "to be an agent to sell IOM . . . [but] have since then gone into the development of applications business using [Sarnoff's] base technology [and] essentially have become a competitor with no background license.  You have engaged Sarnoff and are working together with the technical team to use Sarnoff's money and resources and then you submit patent applications under your name."  Endres continued that "[m]ixing in old IP and specific

application IP from Hoyos not only raises doubt in GE's mind, but Sarnoff doesn't even understand and feels very slighted because this was thrown in by you at the last minute only to gain [a] negotiation advantage."  Endres concluded that "Sarnoff does acknowledge the [Hoyos Companies'] role in developing GE (as an agent role) and for leading the Tier-2 product concept, but Sarnoff is the one doing the work and carrying the expense."

60.     In an e-mail also dated June 16, 2006, Hoyos responded to Endres, conceding that he did file a patent application involving Sarnoff's IOM System, but that "we will gladly sign over this disclosure to Sarnoff at no cost whatsoever."  Notwithstanding the clear and unequivocal language of the Thales Agreement, the Thales/GE Agreement, and the Pegasus Agreement, each of which states that the Hoyos Companies were acting as "agents" for Sarnoff, Hoyos claimed: "we are not simply an agent, we are much more.  I am not going to go into [a] detailed explanation, you all know what I mean. . . .  I know how to make this joint [v]enture a billion dollar business and this is why GE wants to do the deal and is why they want me in the deal, but the time for when I make other people rich and I end up walking away with scraps is over for me."

61.     On or about June 22 or 23, 2006, Zappia updated his sketches from June 2nd, with detailed technical specifications for the Tier-2 Product.

62.     On June 23, 2006, Zappia again tested the prototype for the Tier-2 Product, which again functioned properly.

63.     On or around June 26, 2006, GE Security, apparently concerned about Defendants' claims that the Hoyos Companies owned certain intellectual property related to Sarnoff's IOM technology, informed Sarnoff that it wanted to include the Hoyos Companies as a

signatory to the joint venture MOU.  On the same day, Endres sent Hoyos an e-mail expressing his displeasure over this development and his skepticism that the deal would ever close.

66. 64.     Indeed, no joint venture was ever consummated, due, upon information and belief, in large part to GE Security's expressed concerns over the manner in which Hoyos and the Hoyos Companies conduct business, and Defendants' claims that the Hoyos Companies owned certain intellectual property related to Sarnoff's IOM technology.

65.     On June 30, 2006, Zappia circulated to the Sarnoff IOM team a document titled "IOM Door Configuration" (the "Tier-2 Configuration Report"), which described, in precise details, the configuration and technical specifications for the Tier-2 Product, including an in-depth comparison between Sarnoff's existing portal IOM System and the new over-the-door system.

66.     Over the course of the next two months, Sarnoff continued to test and refine the Tier-2 Product, making incremental, yet significant technical improvements.

67.     On August 9, 2006, Hanna wrote to several Sarnoff employees regarding an upcoming demo of the Tier-2 Product, explicitly referring to it as the "Zappia V2 unit." Similarly, on August 17, 2006, Hoyos wrote to several Sarnoff and GE Security representatives about the Tier-2 Product, describing it as a product that "stems from the same [IOM] System."

68.     On September 1, 2006, Sarnoff filed a provisional patent application for the Tier-2 Product, titled "Method and Apparatus for Iris Biometrics Above an Entryway Using IOM Technology."  The provisional application stated that the invention was conceived on June 26, 2006, and that the inventor was Zappia.

69.     On September 6, 2006, Endres sent an e-mail to Hoyos, informing him that Sarnoff would not be renewing any of the expired agent agreements with the Hoyos

Companies, writing: "With your insistence that you have some claim to our intellectual property and designs to the Iris-on-the-move [and] your representations to major corporations that you own something[,] Sarnoff cannot go forward with any business arrangement. . . . [Y]ou obviously want [to] compete with Sarnoff using Sarnoff owned intellectual property and confidential information and that behavior will not be tolerated…. Our goals are no longer aligned and you are considered a competitor.  You are not authorized to use any Sarnoff information, material, intellectual property, confidential knowledge in any shape or form."

70.     On the same day, Hoyos Group, through its counsel, wrote to Sarnoff claiming that Hoyos Group has "full ownership of all rights relating to the design of the Tier-2 Product which utilizes Iris on the Move (IOM) technology."   In addition, Hoyos Group emphasized that the "disclosure or use of any proprietary information relating to the Tier-2 design by Sarnoff is expressly prohibited," threatening that Hoyos Group would "stand firm and aggressively defend those rights."

71.     On September 19, 2006, Sarnoff, through its counsel, responded to Hoyos Group's September 6th letter, rejecting its claims as "meritless," and emphasizing that "Sarnoff is the sole and exclusive owner of the IOM technology and intellectual property, including Sarnoff's 'over the door' system."   In addition, Sarnoff also (i) reiterated that all agent agreements between the Hoyos Companies and Sarnoff were, by their own terms, no longer in effect and would not be renewed; (ii) demanded that Hoyos return to Sarnoff all materials incorporating Sarnoff Proprietary Information in accordance with the various confidentiality agreements entered into by the parties; (iii) emphasized that pursuant to the various confidentiality agreements, Hoyos and his employees and agents were not authorized to use or disclose any Sarnoff Proprietary Information; (iv) noted that Hanna, pursuant to his Employee

Termination Statement and his Employee Patent and Computer Software Agreement, was not entitled to use or disclose Sarnoff Proprietary Information; and (v) demanded that Hoyos and his employees cease and desist from contacting companies with which Sarnoff had prospective business relations, as such communications were "undertaken with the intent of derailing a potential transaction with Sarnoff."

72.     Defendants have nevertheless engaged, since at least late 2006, in a pattern of deliberately interfering with Sarnoff's prospective business relations.  For example, during December 2006 and January 2007, Defendants misinformed representatives of L-1, a company to which Sarnoff was attempting to sell its IOM technology, that the Hoyos Companies owned part of Sarnoff's IOM technology, including the Tier-2 Product, and that a transaction between Sarnoff and L-1 could not be completed without their participation.

73.     The transaction between L-1 and Sarnoff, a deal valued at approximately three million dollars, was never completed, due, at least in part, to the false representations made by the Hoyos Companies.

74.     Upon information and belief, the Hoyos Companies made these knowingly false statements with the intent of sabotaging Sarnoff's potential deal with L-1.

75.     On February 23, 2007, counsel for Sarnoff advised the Hoyos Companies that as a result of their false and improper statements to L-1, the proposed transaction between L-1 and Sarnoff had not been completed.  Sarnoff again demanded that the Hoyos Companies "immediately cease and desist from continuing to make representations that they own or have rights to [Sarnoff's IOM technology and the intellectual property embedded therein, including Sarnoff's Tier-2 Product], and that they refrain from utilizing in any way any of Sarnoff's patents, trade secrets, confidential information, or other intellectual property."

76.   On March 5, 2007, counsel for the Hoyos Companies wrote to Sarnoff's counsel, responding to Sarnoff's February 23rd letter, claiming that the Hoyos Companies designed the Tier-2 Product using their "own resources and ideas."  In addition, counsel for the Hoyos Companies cautioned Sarnoff's counsel to "*please advise Sarnoff that it is expressly prohibited from disclosing or using any proprietary information relating to the Tier-2 design or any modification thereof.*"   (emphasis in original).   Counsel for the Hoyos Companies also emphasized that it expressly "reserve[d] all of its [clients'] rights against Sarnoff with respect to any prohibited disclosures made by Sarnoff . . . ."

77.   During the ISC West Show in Las Vegas from March 28-30, 2007, the Hoyos Companies demonstrated what they publicly claimed to be their own version of an IOM system, which they called the "H-Box."

78.   Upon information and belief, numerous participants and consumers at the ISC West Show commented that the H-Box resembled Sarnoff's IOM System.  In fact, several consumers stated that they believed the H-Box was a Sarnoff product.

79.   Upon information and belief, the H-Box operates in a manner that is substantially similar to Sarnoff's IOM System.

80.   The Hoyos Companies have designed, developed, manufactured, marketed, advertised, offered for sale, and sold the H-Box without the knowledge or permission of Sarnoff.

81.   During the entire period that the Hoyos Companies' served as limited agents representation of Sarnoff, they had access to Sarnoff's Proprietary Information relating to the IOM System, the IAD System, and the Tier-2 Product, including, but not limited to, Sarnoff's (i) copyrighted software and design documents; (ii) trade secrets; and (iii) patent applications.

The Hoyos Companies do not, nor have they ever had a license to use such Proprietary Information for their own pecuniary gain.  In fact, pursuant to the various confidentiality agreements and agent agreements entered into by the parties, the Hoyos Companies were contractually obligated to maintain the confidentiality of this information and to refrain from using it for their own advantage.

82.     Upon information and belief, the H-Box improperly incorporates Sarnoff's Proprietary Information.

83.     Given the substantial similarities between the two products, Sarnoff, through its counsel, wrote to counsel for the Hoyos Companies on April 27, 2007, reminding him that (i) over the years, the Hoyos Companies had been privy to Sarnoff's Proprietary Information regarding iris recognition research and development and the design, development, and operation of Sarnoff's IOM System; and (ii) the Hoyos Companies were not authorized to use Sarnoff's Proprietary Information for their own gain, especially to "design around" the claims in Sarnoff's patent applications.

84.     The Hoyos Companies' counsel responded on May 1, 2007, "categorically denying" that (i) the Hoyos Companies used any of Sarnoff's Proprietary Information in developing the H-Box; (ii) the Hoyos Companies violated any agreement with Sarnoff; and (iii) the H-Box infringed any Sarnoff technology.

85.     Despite several demands for the Hoyos Companies to return to Sarnoff its Proprietary Information, the Hoyos Companies have not returned any such information.

86.     Similarly, despite repeated demands for the Hoyos Companies to refrain from using the Proprietary Information, they continue to do so.

87.     Unless enjoined by this Court, the Hoyos Companies will continue their course of conduct of wrongfully using, infringing upon, selling, and otherwise profiting from Sarnoff's Proprietary Information.

### FIRST COUNT – DECLARATORY JUDGMENT OF NONINFRINGEMENT

88.     Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 87 of this Complaint, as if set forth fully at length herein.

89.     Upon information and belief, the Hoyos Companies are the owners of U.S. Patent Applications Numbers 11/713,894 ("the '894 patent application") and 11/559,381 ("the '381 patent application"), as well as other U.S. patents and patent applications.

90.     Upon information and belief, the Hoyos Companies claim to be the owners of various copyrights with respect to software, designs, and algorithms related to Sarnoff's Tier-2 Product (the "Hoyos Copyrights").

91.     The Hoyos Companies have stated to Sarnoff on a number of occasions, including but not limited to their September 6, 2006 and March 5, 2007 letters, that (i) Sarnoff has no rights in or to the Tier-2 Product, (ii) Sarnoff is prohibited from using or disclosing any proprietary information related to the Tier-2 Product, and (iii) the Hoyos Companies will aggressively defend and assert their rights in and to the Tier-2 Product.

92.     The Hoyos Companies have stated in communications with L-1 and other third parties, including potential customers of Sarnoff, that Sarnoff is not authorized to use the Hoyos Companies' intellectual property, which includes the '894 patent application, the '381 patent application, and the Hoyos Copyrights.

93.     Sarnoff is continuing to make, use, sell, and offer for sale in the United States its Tier-2 Product.

94.     The foregoing actions and statements of the Hoyos Companies, including their September 6, 2006 and March 5, 2007 letters to Sarnoff and their statements to L-1 and other third parties, leave Sarnoff in reasonable apprehension of suit for infringement under the Hoyos Companies' purported intellectual property portfolio, including the Hoyos Copyrights.

95.     Sarnoff does not infringe any patents, copyrights, or other intellectual property owned by the Hoyos Companies.

96.     For the reasons noted above, Sarnoff is the sole and exclusive owner of the IOM System, the IOM technology, and the Tier-2 Product, including all the intellectual property embedded therein.

97.     Accordingly, Sarnoff is entitled to a declaratory judgment of non-infringement of any of the Hoyos Companies' intellectual property.

### SECOND COUNT - BREACH OF CONTRACT AGAINST HOYOS AND THE HOYOS COMPANIES

98.     Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 97 of this Complaint, as if set forth fully at length herein.

99.     Hoyos and the Hoyos Companies are parties to the following contracts with Sarnoff, which although no longer in effect, contain confidentiality provisions that survive their expiration or termination: the Thales/GE Agreement, the Pegasus Agreement, the October 2005 CDA, and the December 2005 CDA.

100.    Hoyos and the Hoyos Companies breached the express terms of these agreements by, among other things (i) using Sarnoff's Proprietary Information without Sarnoff's knowledge or consent for their own pecuniary benefit and not for the limited purpose specified in the agreements; and (ii) disclosing to third parties Sarnoff's Proprietary Information without Sarnoff's knowledge or consent.

101.    Sarnoff has continued to honor its confidentiality obligations under the various agreements in spite of the Hoyos Companies' breaches.

102.    As a direct and proximate result of Hoyos' and the Hoyos Companies' breaches of confidentiality and usage of Sarnoff's Proprietary Information, Sarnoff has been and will continue to be damaged unless and until this Court orders the Hoyos Companies specifically to honor their confidentiality obligations under the various agreements.

### THIRD COUNT - BREACH OF CONTRACT AGAINST HANNA

103.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 102 of this Complaint, as if set forth fully at length herein.

104.    Hanna is a party to the following contracts with Sarnoff: the Employee Termination Statement and the Employee Patent and Computer Software Agreement, both of which contain confidentiality provisions.

105.    Hanna breached the express terms of these agreements by, among other things (i) using Sarnoff's Proprietary Information without Sarnoff's knowledge or consent for his own pecuniary benefit; and (ii) disclosing to third parties Sarnoff's Proprietary Information without Sarnoff's knowledge or consent.

106.    Sarnoff has continued to honor its confidentiality obligations under the various agreements in spite of Hanna's breaches.

107.    As a direct and proximate result of Hanna's breaches of confidentiality and usage of Sarnoff's Proprietary Information, Sarnoff has been and will continue to be damaged unless and until this Court orders Hanna specifically to honor his confidentiality obligations under the various agreements.

### FOURTH COUNT - BREACH OF DUTY OF LOYALTY AGAINST HANNA

108.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 107 of this Complaint, as if set forth fully at length herein.

109.    During his employment with Sarnoff, Hanna owed fiduciary duties and duties of loyalty to Sarnoff.  These duties encompassed, among other things, the duty not to misuse or disclose Sarnoff's Proprietary Information.  Moreover, these fiduciary duties continued even after the employee relationship terminated to the extent of obligating Hanna not to disclose or use Sarnoff's Proprietary Information.

110.    Hanna has breached his duty of loyalty to Sarnoff by, among other things, using and disclosing Sarnoff's Proprietary Information and trade secrets.

111.    Hanna continues to actively wrongfully use and disclose Sarnoff's Proprietary Information and trade secrets, and, unless enjoined by this Court, will continue to use and disclose Sarnoff's Proprietary Information and trade secrets for his own benefit and to Sarnoff's detriment.

112.    Sarnoff has suffered and will continue to suffer irreparable harm and financial loss as a result of this conduct, unless Hanna is enjoined from this conduct.

113.    Sarnoff is also entitled to compensatory and punitive damages for Hanna's wrongful, intentional, and malicious conduct in an amount to be determined at trial.

### FIFTH COUNT – MISAPPROPRIATION OF TRADE SECRETS AGAINST ALL DEFENDANTS

114.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 113 of this Complaint, as if set forth fully at length herein.

115.    Sarnoff's Proprietary Information consists of confidential information regarding designs, algorithms, software, hardware, and other intellectual property used in its IOM technology.  Because the Proprietary Information is not generally known to the public or to

other persons, it gives Sarnoff an advantage over its competitors, and has tremendous economic value to Sarnoff. Sarnoff has gone to great lengths to maintain the secrecy of its Proprietary Information, including executing confidentiality agreements with all third parties and employees to whom it plans to provide such Proprietary Information. In light of the foregoing, Sarnoff's Proprietary Information constitutes trade secrets.

116.    Pursuant to the various agreements between the Hoyos Companies and Sarnoff, Defendants were privy to and had access to Sarnoff's trade secrets. In addition, Hanna was also privy to and had access to Sarnoff's trade secrets as a Sarnoff employee.

117.    Upon information and belief, Defendants have knowingly misappropriated and disclosed Sarnoff's trade secrets, including impermissibly incorporating such trade secrets into the H-Box.

118.    By reason of the foregoing acts and conduct of Defendants, Sarnoff will suffer irreparable harm and damage, which damage will be difficult to ascertain, and Sarnoff will be without an adequate remedy at law.

119.    Sarnoff is entitled to an injunction restraining Defendants, and all persons or entities acting in concert with them, from engaging in further such unlawful acts and from reaping any additional commercial advantage from their misappropriation of Sarnoff's trade secrets.

120.    Sarnoff is further entitled to recover from Defendants the damages sustained by it as a result of Defendants' wrongful acts as hereinabove alleged. The amount of such damages cannot be determined at this time. Sarnoff is further entitled to recover from Defendants the gains, profits, advantages, and unjust enrichment they have obtained as a result of

their wrongful acts as hereinabove alleged. Sarnoff is at present unable to ascertain the full extent of these gains, profits, advantages, and unjust enrichment obtained by Defendants as a result of their wrongful acts.

121.    Defendants' acts of misappropriation were both willful and malicious, and therefore Sarnoff is entitled to punitive damages against Defendants.

## SIXTH COUNT - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST ALL DEFENDANTS

122.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 121 of this Complaint, as if set forth fully at length herein.

123.    Sarnoff has a reasonable expectation of prospective economic advantage with a number of third parties, including L-1, with respect to its IOM System and the Tier-2 Product.

124.    Upon information and belief, Defendants have wrongfully, intentionally, and maliciously interfered with Sarnoff's prospective economic advantage under the IOM System and Tier-2 Product lines by, among other things, making false statements to various third parties, including L-1, that the Hoyos Companies owned rights in and to the Tier-2 Product and that any transaction between Sarnoff and a third party with respect to the Tier-2 Product could not be completed without the participation of the Hoyos Companies.

125.    Upon information and belief, Sarnoff has suffered losses through Defendants' wrongful, intentional, and malicious interference, including the loss of a three million dollar contract with L-1, and will continue to be damaged unless and until the Court enjoins Defendant's improper conduct.

## SEVENTH COUNT – CONVERSION AGAINST ALL DEFENDANTS

126.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 125 of this Complaint, as if set forth fully at length herein.

127.    Defendants' wrongful retention and use of Sarnoff's Proprietary Information constitutes conversion of Sarnoff's property.

128.    As a result of this misconduct, Sarnoff has suffered, and will continue to suffer, irreparable harm and financial loss, unless it receives injunctive relief.

129.    Defendants' actions were willful, intentional, and malicious, entitling Sarnoff to compensatory and punitive damages in an amount to be determined at trial.

## EIGHTH COUNT – FEDERAL FALSE DESIGNATION OF ORIGIN AGAINST THE HOYOS COMPANIES

130.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 129 of this Complaint, as if set forth fully at length herein.

131.    The Hoyos Companies have violated Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), by expressly and impliedly making false designations or representations of origin when they released, distributed, advertised, marketed, sold, and offered for sale the H-Box as a Hoyos Companies' product, even though the H-Box is based upon and incorporates the proprietary intellectual property and IOM technology of Sarnoff.

132.    Upon information and belief, the Hoyos Companies have intentionally and knowingly engaged in the foregoing conduct in order to cause confusion and deception of the consuming public by falsely and fraudulently suggesting and representing by the aforesaid conduct that the H-Box and the IOM technology incorporated therein are the property of the Hoyos Companies, when in fact, the Tier-2 Product—on which the H-Box is based—and the IOM technology are the property of Sarnoff.

133.    Based on the Hoyos Companies' actions, the public is likely to be confused as to the source and origin of the H-Box, the Tier-2 Product, and IOM technology, and, upon information and belief, the public has been, and will continue to be misled.

134.    As a direct and proximate result of the aforesaid wrongful acts of the Hoyos Companies, Sarnoff has been damaged and the Hoyos Companies have made profits in an amount to be determined at trial.

135.    Sarnoff is entitled, pursuant to 15 U.S.C. § 1117(a), to three times the Hoyos Companies' profits from the H-Box or three times Sarnoff's damages, whichever is greater, plus reasonable attorneys' fees and the costs of suit.

## NINTH COUNT – FEDERAL FALSE ADVERTISING AGAINST THE HOYOS COMPANIES

136.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 135 of this Complaint, as if set forth fully at length herein.

137.    The Hoyos Companies have publicly announced to consumers that the H-Box and the IOM technology incorporated therein are the property of the Hoyos Companies, when, in fact, the H-Box is based upon Sarnoff's proprietary Tier-2 Product and Sarnoff is the sole and exclusive owner of the IOM technology.

138.    The Hoyos Companies' public announcements are false and misleading and constitute false and misleading descriptions and misrepresentations of fact, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

139.    As a direct and proximate result of the aforesaid wrongful acts of the Hoyos Companies, Sarnoff has been damaged and the Hoyos Companies have made profits in an amount to be determined at trial.

140.    Sarnoff is entitled, pursuant to 15 U.S.C. § 1117(a), to three times the Hoyos Companies' profits from the H-Box or three times Sarnoff's damages, whichever is greater, plus reasonable attorneys' fees and the costs of the suit

## TENTH COUNT – UNFAIR COMPETITION AND FALSE ADVERTISING UNDER TITLE 56:4-1 OF THE NEW JERSEY CODE AGAINST THE HOYOS COMPANIES

141.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 140 of this Complaint, as if set forth fully at length herein.

142.    The Hoyos Companies aforesaid conduct constitutes unfair, unlawful, and fraudulent business practices in violation of N.J. Stat. Ann. § 56:4-1.

143.    These wrongful acts have proximately caused and continue to cause Sarnoff substantial injury, including loss of customers, dilution of its goodwill, confusion of potential customers, injury to its reputation, and diminution in the value of Sarnoff's Proprietary Information.  These actions will cause imminent irreparable harm and injury to Sarnoff, the amount of which will be difficult to ascertain, if they continue.  Sarnoff is without an adequate remedy at law.

144.    Sarnoff is entitled to an injunction restraining the Hoyos Companies, and all persons or entities acting in concert with them, from engaging in further such unlawful conduct.

145.    Sarnoff is entitled to recover from the Hoyos Companies the damages sustained by it as a result of the Hoyos Companies' wrongful acts as hereinabove alleged.  The amount of such damages cannot be determined at this time.  Sarnoff is further entitled to recover from the Hoyos Companies the gains, profits, and advantages they have obtained as a result of their wrongful acts as hereinabove alleged.  Sarnoff is at present unable to ascertain the full extent of these gains, profits, and advantages, but Sarnoff is informed and believes and based

thereon alleges that the Hoyos Defendants have obtained such gains, profits, and advantages in an amount thus far undetermined.

146.    The conduct of the Hoyos Companies was and is fraudulent, oppressive, malicious, and in conscious disregard of the rights of Sarnoff, and Sarnoff is therefore entitled to punitive damages against the Hoyos Companies.

## ELEVENTH COUNT – FRAUD AND MISREPRESENTATION IN CONNECTION WITH SALE OF MERCHANDISE UNDER TITLE 56:8-2 OF THE NEW JERSEY CODE AGAINST THE HOYOS COMPANIES

147.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 146 of this Complaint, as if set forth fully at length herein.

148.    The Hoyos Companies have publicly announced to consumers that the H-Box and the IOM technology incorporated therein are the property of the Hoyos Companies, when, in fact, the H-Box is based upon Sarnoff's proprietary Tier-2 Product and Sarnoff is the sole and exclusive owner of the IOM technology.

149.    Upon information and belief, the Hoyos Companies have made such knowingly false statements on numerous occasions, including, for example, at the ISC West Show in Las Vegas on March 28-30, 2007.

150.    The Hoyos Companies have used and employed such unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts, with the intent that others would rely upon such concealment, suppression, or omission, in connection with the sale and advertisement of merchandise, in violation of Title 56:8-2 of the New Jersey Code.

## TWELFTH COUNT – COMMON LAW UNFAIR COMPETITION, FALSE ADVERTISING, UNJUST ENRICHMENT, AND MISAPPROPRIATION AGAINST THE HOYOS COMPANIES

151.    Sarnoff repeats and realleges the allegations set forth in Paragraphs 1 through 150 of this Complaint, as if set forth fully at length herein.

152.    The Hoyos Companies' wrongful public claims of ownership to the Tier-2 Product and the IOM technology and their unauthorized use of Sarnoff's Proprietary Information, trade secrets, and intellectual property in designing the H-Box constitutes common law unfair competition, unjust enrichment, and misappropriation by which Sarnoff has been damaged and will continue to be damaged.

## DEMAND FOR RELIEF

WHEREFORE, Sarnoff respectfully request that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, without limitation, the following:

1.    A declaration that Sarnoff's production, use, or sale of Sarnoff's Tier-2 Product or the IOM System does not infringe on any patents that may be owned by the Hoyos Companies.

2.    A declaration that no Hoyos Copyrights are infringed by Sarnoff's production, use, or sale of Sarnoff's Tier-2 Product or the IOM System.

3.    An injunction prohibiting Defendants from using or disclosing, in any manner whatsoever, Sarnoff's confidential and/or Proprietary Information and/or trade secrets;

4.    An injunction prohibiting Defendants from interfering with Sarnoff's prospective economic advantage;

5.    An injunction prohibiting Hanna from breaching his duty of

loyalty to Sarnoff;

6.      An injunction prohibiting Defendants from otherwise unfairly competing with Sarnoff;

7.      An injunction prohibiting Defendants from making false and misleading statements about the ownership of the Tier-2 Product, the IOM System, or the IOM technology;

8.      An injunction prohibiting Defendants from assisting, aiding, or abetting any other person or business entity in engaging in any of the activities referred to in this Demand for Relief Paragraphs (4) through (8) above;

9.      An Order directing Defendants to return to Sarnoff all originals and copies of any documents, whether in hard copy or computerized or electronic media form, which contain Sarnoff's confidential and/or Proprietary Information and/or trade secrets;

10.     Upon the return of the foregoing confidential, proprietary, and/or trade secret information, directing Defendants to execute an Affidavit, under oath and subject to all appropriate penalties, stating that neither the Defendants, nor any persons acting in concert with them, have the original or any copies of the foregoing confidential, proprietary and/or trade secret information in their possession, custody or control;

11.     A finding that Defendants have breached their contractual confidentiality obligations to Sarnoff;

12.     A finding that Hanna has breached his duty of loyalty owed to Sarnoff;

13.     A finding that Defendants have misappropriated Sarnoff's trade secrets;

14.     A finding that the Hoyos Companies have committed unfair, unlawful, and fraudulent business practices;

15.     A finding that Defendants have tortiously interfered with Sarnoff's prospective economic advantage with third-parties, including potential customers;

16.     A finding that Defendants have converted Sarnoff's property;

17.     A finding that the Hoyos Companies have falsely designated the origin of its H-Box, falsely advertised its H-Box, and made misrepresentations in connection with the sale of merchandise;

18.     A finding that the Hoyos Companies have been unjustly enriched at the expense of Sarnoff;

19.     An award granting Sarnoff monetary relief, including compensatory, punitive, and exemplary damages; the costs of the action; and treble damages pursuant to all applicable laws, including 15 U.S.C. § 1117;

20.     An award granting Sarnoff attorneys' fees in this action pursuant to applicable laws, including 15 U.S.C. § 1117;

21.     An order directing that the Hoyos Companies account for all gains, profits, and advantages derived from their improper acts and for their other violations of law;

22.     Pre-judgment and post-judgment interest on all amounts awarded pursuant to applicable laws; and

23.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Sarnoff hereby demands a trial by jury on all issues triable by a jury.

May 14, 2008                        /s/  David Leit_____
                                   David Leit
                                   Matthew Savare
                                   Frank LeFebvre
                                   **LOWENSTEIN SANDLER PC**
                                   Attorneys At Law
                                   65 Livingston Avenue
                                   Roseland, New Jersey  07068
                                   973.597.2500
                                   Attorneys For Plaintiff